UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KIMBERLY GASKILL,               )
                                )
            Plaintiff,          )
                                )
      vs.                       )        Case No. 4:09CV1556 CDP
                                )
MICHAEL J. ASTRUE,              )
Commissioner of Social Security,)
                                )
            Defendant.          )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Kimberly Gaskill's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§

401 *et seq.* and supplemental security income benefits under Title XVI of the Act,

42 U.S.C. §§ 1381 *et seq.* Claimant Gaskill brings this action asserting that she is

disabled because she suffers affective mood disorder and anxiety disorder. The

Administrative Law Judge concluded that Gaskill was not disabled. Because the

Administrative Law Judge failed to give proper weight to the medical evidence, I

will reverse the ALJ decision and remand for further consideration.

Procedural History

On August 28, 2007, Kimberly Gaskill filed for a Period of Disability and

Insurance Benefits and for Supplemental Security Income payments. Both

applications alleged disability beginning January 1, 2001. The claims were denied

initially on October 10, 2007, and a request for hearing was timely filed. Gaskill

appeared and testified at a hearing held on April 2, 2009. At that time, Gaskill

amended her disability onset date to April 21, 2006. The ALJ issued an opinion

on April 22, 2009, upholding the denial of benefits. On July 30, 2009, the

Appeals Council of the Social Security Administration denied Gaskill's request for

review. The ALJ's decision thus stands as the final determination of the

Commissioner. Gaskill filed this appeal on September 23, 2009.

<u>Evidence Before the ALJ</u>

Gaskill was 43 years of age at the time of her hearing, was 5'8" tall, and

weighed approximately 140 pounds. Gaskill testified that her only physical

problem was back pain, for which she alleged chiropractic treatment and did not

report any diagnosis of back impairment. Gaskill reported successful carpal tunnel

surgery during summer 2008. She estimated she could lift up to 30 pounds and

stated that she works out at a gym 5 times per week by walking on a treadmill for

28 minutes and lifting 5 pound weights in each hand.

Gaskill said that she received a certificate of achievement from high school,

but that she could neither read nor write. Gaskill claimed she had tutors and was

in special education classes throughout school. Gaskill testified she could make change at a grocery store and read familiar labels. Gaskill stated she lived with her 17-year old son and that she could cook and drive. Gaskill acknowledged a previous problem with alcohol abuse but stated that she had been abstinent for five years and goes to Alcoholics Anonymous ("AA") meetings about five times per week.

Gaskill testified that she was last hospitalized for psychiatric reasons in 2007, and that she continued to have approximately two anxiety attacks per week and that these attacks each last about an hour. Gaskill stated that her crying spells were controlled with medication. She stated she has low energy and low motivation.

Gaskill completed a function report dated September 11, 2007. In this report, Gaskill indicated that she wakes up each day at 6:30 a.m., makes her son's lunch and drives him to school. She then takes her medicine, does some "wordcross" puzzles, watches television, and feeds the household pets. Gaskill reported no problems with her personal care nor with remembering to take her medications. She reported that she could drive, shop by herself, count change, pay bills, handle a savings account, and use a checkbook. She reported that she goes to AA once per week and Crider Center twice per week. Gaskill stated she had no

problems getting along with peers or with authority figures. On a section asking how she followed spoken instructions, Gaskill wrote: "OK as long as they aren't complicated."

Gaskill's stepfather, Edward Kelley (Kelley), submitted a statement regarding Gaskill's daily activities. Kelley reported that Gaskill raises her son with no outside assistance. This includes preparing his meals, driving him to school, and washing laundry. Kelley described Gaskill's daily activities as completing chores as needed, watching television, and attending AA and Crider Center meetings. Kelley stated that Gaskill shops by herself and is able to count change, pay bills, and use a checkbook. He reported that Gaskill had no problems with personal grooming. Kelley stated that Gaskill had left jobs where the pressure was "too great," but that she had no problems getting along with authority figures, friends, or neighbors.

<u>Medical Evidence Before the ALJ</u>

William Wang, M.D., has provided Gaskill intermittent outpatient psychiatric treatment. On April 21, 2006, Dr. Wang diagnosed Gaskill with generalized anxiety disorder, attention-deficit hyperactivity disorder ("ADHD"), alcohol abuse in sustained remission, and rule/out borderline IQ. Gaskill's mood was reported as "OK," and her affect was mildly anxious/dysphoric, with a mildly

tangential flow of thought.  Dr. Wang assessed Gaskill's Global Assessment of Functioning ("GAF")[1] at a level of 50.[2]  Gaskill was prescribed Seroquel.

In June 2006, Gaskill was again assessed a GAF of 50.  Gaskill was prescribed Trazodone, Paxil, Hydroxyzine, and Klonopin.  Drowsiness was listed as a potential side effect.  Gaskill complained of anger issues, problems concentrating, and difficulty paying attention.

In a Mental Residual Functional Capacity Questionnaire dated July 7, 2006, Dr. Wang assessed Gaskill's ability to do certain work-related functions.  The questionnaire used the following scale: "<u>unlimited or very good</u>", "<u>limited but satisfactory</u>", "<u>seriously limited, but not precluded</u>", "<u>unable to meet competitive standards</u>", and "<u>no useful ability to function</u>."  <u>Seriously limited, but not precluded</u> means a substantial loss of ability to perform the work-related activity. <u>Unable to meet competitive standards</u>  means that the person cannot satisfactorily perform the activity independently, appropriately, effectively and on a sustained basis in a regular work setting.  <u>No useful ability to function</u> was defined as an

[1]The GAF is a numeric scale ranging from zero to one hundred and is used to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness."  *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 32–34 (Text Rev. 4th ed. 2000) (DSM-IV).

[2]A GAF of 41 through 50 is characterized by serious impairment in social, occupational, or school functioning, such as the inability to keep a job.  *Id.* at 34.

extreme limitation denoting the inability to perform the activity in a regular work setting.  Dr. Wang checked 20 activities as "limited but satisfactory"[3] and checked 10 activities as "seriously limited, but not precluded."[4]  No activities fell into the categories marked "unlimited or very good", "unable to meet competitive standards" or "no useful ability to function."  Dr. Wang did not provide additional information related to his categorization of abilities.  Dr. Wang responded "No" to a question asking whether Gaskill had a low IQ or reduced intellectual functioning, and responded  "No" to a question asking if Gaskill's symptoms were exacerbated by psychiatric conditions.  Dr. Wang estimated that that Gaskill would miss more than four work days per month, and that these impairments had existed

---

[3]  These activities included: Remember work-like procedures; Understand and remember very short and simple instructions; Carry out very short and simple instructions; Sustain an ordinary routine without special supervision; Complete a normal workday and workweek without interruptions from psychologically based symptoms; Perform at a consistent pace without an unreasonable number and length of rest periods; Ask simple questions or request assistance; Accept instructions and respond appropriately to criticism from supervisors; Be aware of normal hazards and take appropriate precautions; Understand and remember detailed instructions; Interact appropriately with the general public; Maintain socially appropriate behavior; Adhere to basic standards of neatness and cleanliness; Travel in unfamiliar place; and Use public transportation.

[4]  These activities included:  Maintain attention for two hour segment; Maintain regular attendance and be punctual within customary, usually strict tolerances; Work in coordination with or proximity to others without being unduly distracted; Make simple work-related decisions; Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; Respond appropriately to changes in a routine work setting; Deal with normal work stress; Carry out detailed instructions; Set realistic goals or make plans independently of others; and Deal with stress of semiskilled and skilled work.

for an "[u]nknown" time, but since a "[y]oung age." Dr. Wang assessed Gaskill's GAF at 50, and estimated the highest GAF in the past year at 55.[5]

Progress notes from August 2006 indicate Gaskill complained of "jitters" and "panic attacks." She had normal movement, anxious affect, appropriate content of thought, and was fully oriented. She had fair/age appropriate memory and general cognition and good/fair insight and judgment.

February 2007, Dr. Wang noted that Gaskill again appeared anxious, but that her memory, cognition, insight, and judgment lacked impairment and that she was fully oriented. He assessed her with a GAF score of 50.

July 2007 progress notes show that Gaskill appeared depressed, but Dr. Wang again found her memory, cognition, insight, and judgment lacked impairment and that she was fully oriented. Gaskill reported that she had stopped taking Paxil and Klonopin. Dr. Wang assessed her GAF at 50.

August 2007, Dr. Wang noted that Gaskill was anxious, but fully oriented. She had appropriate content of thought and her insight and judgment were both good/fair. Dr. Wang marked Gaskill's general cognition and memory as "impaired." Dr. Wang assessed her GAF at 45 and wrote that he "will support

---

[5]A GAF rating of 51 through 60 is characterized by moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV, *supra*, at 34.

disability."

September 2007 progress notes indicate that Gaskill was anxious and had impaired memory and general cognition, but was otherwise fully oriented with good/fair judgment and insight. At this session, Gaskill reported that her Celexa prescription was "helpful" and that she was sleeping better. Gaskill noted that she began attending AA again after a relapse from "smok[ing] pot." Dr. Wang assessed her GAF score at 45.

November 2007, Gaskill's mood was described as "good" and her affect "euthymic." Her memory and general cognition were impaired, but her insight and judgment were both good/fair. She described herself as "doing great." Dr. Wang assessed her GAF score at 46.

In November 2007, Dr. Wang again assessed Gaskill's ability to perform work functions. The questionnaire utilized the following criteria: "unlimited or very good" - ability to function is more than satisfactory; "good" - ability is limited but satisfactory; "fair" - ability to function is seriously limited but not precluded; and "poor or none" - no useful function in this area. All abilities were marked "fair" except five, which were marked "poor or none."[6] Dr. Wang found

---

[6]The five categorized as "poor or none" included: Maintain attention for two hour segments; Sustain an ordinary routine without special supervision; Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; Deal with normal work

Gaskill to have "fair" ability to deal with the stress of semiskilled and skilled work, but "poor or no[]" ability to deal with normal work stress. Dr. Wang also noted that Gaskill had no symptoms of poor memory recall or of unusual dress. He found Gaskill had "marked"[7] difficulties in maintaining social functioning, "moderate" restrictions of daily living activities, and was likely to "often" experience deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. Episodes of decompensation in work causing the individual to withdraw were expected to be "repeated."

On November 21, 2007, Gaskill underwent an initial psychiatric evaluation at the Crider Center, which was reviewed by Dr. Hassan, M.D. Gaskill stated that in early 2007, she ceased using all psychotropic medications and substituted marijuana until July 2007. In a mental status examination, Gaskill was described as "appropriately dressed." She appeared alert, well-oriented, and cooperative. Her affect was "OK", and her mood was euthymic. She demonstrated no illogical thinking and had relevant speech. Gaskill's memory was within normal limits, and her concentration was fair; she also demonstrated fair insight and judgment. Dr.

---

stress; and Carry out detailed instructions.

[7]"Marked" was defined as "more than moderate, but less than extreme . . . the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, and effectively."

Hassan diagnosed her with Axis I - (1) generalized anxiety disorder; (2)rule/out bipolar disorder, not otherwise specified (NOS); (3) depressive disorder, recurrent; and (4) rule/out adult ADHD. Gaskill reported that she was responding "fairly well" to Celexa and Xanax; Dr. Hassan recommended continued use of those medications. Gaskill was assessed a GAF of 60.

On March 21, 2008, Dr. Sridevi Gavirneni, M.D., noted that Gaskill was fairly groomed and appeared anxious. Gaskill was described as "doing well on Celexa and Xanax" and she stated she was "tolerating them well." Her diagnoses were depression, not otherwise specified ("NOS"); anxiety disorder, NOS; and history of alcohol and marijuana dependence. Her GAF was assessed at 60.

May 1, 2008, Dr. Ahmed, M.D., treated Gaskill. At that time, Gaskill reported to be doing "okay" and medically compliant. She reported good response to medications, including improved concentration. Her diagnoses were major depressive disorder and anxiety disorder. She was continued on same medications.

In a Residual Functional Capacity questionnaire dated November 20, 2008, Dr. Ahmed assessed Gaskill's remaining work-related mental abilities. The questionnaire utilized the following criteria: "unlimited or very good" - ability to function is more than satisfactory; "good" - ability is limited but satisfactory;

"fair" - ability to function is seriously limited but not precluded; and "poor or none" - no useful function in this area. Dr. Ahmed characterized Gaskill's ability to remember work-like procedures as fair. For "perform at a consistent pace without an unreasonable number and length of rest periods", Dr. Ahmed checked both "fair" and "poor or none." Dr. Ahmed did not mark a response for the ability to "get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes." For each of the remaining functions, Dr. Ahmed reported that Gaskill had poor or no ability.[8] Dr. Ahmed found that Gaskill's daily activities would be moderately restricted and that her difficulties in maintaining social functioning would be marked. Deficiencies in concentration, persistence or pace resulting in a failure to complete tasks in a timely manner were estimated to be "frequent." Dr. Ahmed estimated that Gaskill would repeatedly suffer episodes

---

[8]"Unskilled Work" abilities included: Understand and remember very short simple instructions; Carry out very short and simple instructions; Maintain attention for two hour segments; Maintain regular attendance and be punctual with customary, usually strict, tolerances; Sustain an ordinary routine without special supervision; Work in coordination with or proximity to others without being unduly distracted; Make simple work-related decisions; Complete a normal workday and workweek without interruptions from psychologically based symptoms; Ask simple questions or request assistance; Accept instructions and respond appropriately to criticism from supervisors; Respond appropriately to changes in a routine work setting; Deal with normal work stress; Be aware of normal work hazards and take appropriate precautions.

"Semi-Skilled" and "Skilled Work" abilities included: Understand and remember detailed instructions; Carry out detailed instructions; Set realistic goals or make plans independently of others; Deal with stress of semiskilled and skilled work.

Abilities needed for "Particular Types of Jobs" included: Interact appropriately with the general public; Maintain socially appropriate behavior; Adhere to basic standards of neatness and cleanliness; Travel in unfamiliar place; Use public transportation.

of deterioration or decompensation in work which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms.

## Vocational Evidence before the ALJ

Records indicate that Gaskill completed a personal history form for MERS Goodwill dated July 9, 2007. Gaskill indicated that she had a 12th grade education but was illiterate. She expressed no preference as to whether she worked alone or with others. Gaskill's case manager, Ms. Zarbo, wrote that Gaskill was "ready to start work again" because she was receiving psychiatric treatment. Ms. Zarbo noted that Gaskill only wanted to work part-time "so she does not lose her Medicaid." Notes from Ms. Zarbo indicate that Gaskill began a cleaning job at Modern Maintenance on July 25, 2007. On August 9, 2007, Gaskill's supervisor reported to Ms. Zarbo that Gaskill "was doing a great job." On August 13, 2007, Gaskill called Ms. Zarbo and stated that she could no longer attend work because she "was under too much stress" and had just begun taking an anti-depressant.

A vocational expert (V.E.) testified at the administrative hearing. The ALJ asked the V.E. to assume a hypothetical individual with the same education, training, and work experience as Gaskill. The individual would also be able to perform light work; could understand, remember, and carry out simple instructions

and non-detailed tasks; demonstrate adequate judgment to make simple work-related decisions; respond appropriately to supervisors and coworkers; and could perform work at a normal pace without production quotas. The V.E. testified that such an individual could not perform Gaskill's past relevant work, but could perform the jobs of a cleaner, a parking lot attendant and a ticket taker. The ALJ asked a second hypothetical, where the individual had only casual and infrequent contact with others. The V.E. testified that the ticket-taker position would be precluded, but that the individual could still work as a cleaner, parking lot attendant, and as a surveillance system monitor. When asked whether a G.A.F. score of 45 or 46 would preclude gainful employment, the V.E. testified that such scores would denote" serious occupational and social, and educational functioning" and "would preclude competitive employment."

<u>Legal Standard</u>

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support

the ALJ's decision, a court may not reverse it because substantial evidence exists in the record that could have supported a contrary outcome. *Id.* Nor may a court reverse the ALJ's decision because it would have decided the case differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warbuton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the court is required to review the administrative record as a whole to consider:

(1)  the credibility findings made by the Administrative Law Judge;

(2)  the education, background, work history, and age of the claimant;

(3)  the medical evidence from treating and consulting physicians;

(4)  the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5)   any corroboration by third parties of the plaintiff's impairments; and

(6)  the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Sec'y of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir.

1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in any substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current

work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints of the plaintiff, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g.*, *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). In considering subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id.* at 1322.

The ALJ's Findings

The ALJ found that Gaskill was not disabled within the meaning of the Social Security Act from April 21, 2006, through the date of the decision. He issued the following specific findings:

1.   The claimaint meets the insured status requirements of the Social Security Act through September 20, 2009.

2.   The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*, 416 920(b) and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: affective mood disorder and anxiety disorder (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   Gaskill has the residual functional capacity to lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently. She can stand and/or walk for up to 6 hours in an 8-hour workday. She can sit for at least 6 hours in a typical 8-hour workday. This description of the claimant's remaining work-related exertional capabilities coincides with that described for light work in accordance with 20 C.F.R. § 404.1567(b). The claimant retains the ability to understand, remember, and carry out simple instructions and non-detailed tasks; respond appropriately to supervisors and coworkers in a task-oriented

setting where contact with others would be casual and infrequent; and maintain concentration/attention for two-hour segments over an 8-hour period.

6. The claimant was born on March 12, 1966 and was 40 years old on the alleged disability onset date, which is defined as a younger individual age 18–44 (20 C.F.R. §§ 404.1563 and 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§  404.1564 and 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 C.F.R. §§ 404.1568 and 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R.§§ 404.1560(c), 404.1566, 416.960(c0, and 416.966).

10. The claimant has not been under a "disability" as defined in the Social Security Act, from April 21, 2006 through the date of this decision.  (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The ALJ concluded that Gaskill's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that her statements concerning the intensity, duration and limiting effects of these symptoms were not fully credible.  Medical records indicated that when claimant is compliant with her medication regimen, she does not have symptoms that would

preclude her from working. The ALJ further gave little weight to the opinions of Dr. Wang and Dr. Ahmed regarding claimant's residual functional capacity.

Discussion

As previously mentioned, when reviewing a denial of Social Security benefits, a court must determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g). In this case, Gaskill raises three main arguments for why the ALJ's decision denying benefits should be remanded or reversed. First, Gaskill argues that the ALJ failed to accord adequate weight to the opinions of treating physicians, Drs. Wang and Ahmed.[9] Second, Gaskill argues that the ALJ failed to re-contact the claimant's treating medical provider. Third, Gaskill argues that the ALJ failed to discuss records from her hospitalization on May 21, 2007. Because I find Gaskill's first argument meritorious, I do not need to reach her remaining arguments.

Gaskill contends that the ALJ failed to give proper weight to the opinions of Drs. Wang and Ahmed. Generally, the opinions of treating physicians are given controlling weight if their opinions are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other

---

[9]Closely connected with this argument is Gaskill's second: that the ALJ failed to credit the opinions as they were supported by "psychiatric signs."

substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

*See Wildman v. Astrue*, 596 F.3d. 959, 964 (8th Cir. 2010).  "[T]he ALJ must defer

to a treating physician's opinions about the nature and severity of a claimant's

impairments, including symptoms, diagnosis and prognosis, what an applicant is

capable of doing despite the impairment, and the resulting restrictions."  *Ellis v.*

*Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005) (citing 20 C.F.R. § 404.1527(a)(2)).

"However, '[a]n ALJ may discount or even disregard the opinion of a treating

physician where other medical assessments are supported by better or more

thorough medical evidence, or where a treating physician renders inconsistent

opinions that undermine the credibility of such opinions.'" *Wildman*, 596 F.3d. at

964 (alteration in original) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir.

2005) (internal quotation omitted)).

   *Dr. Ahmed*

   The ALJ concluded that Dr. Ahmed's opinion was unsupported by objective

evidence, and therefore not entitled to controlling weight regarding the RFC.  The

ALJ found (1) Dr. Ahmed's opinion was contradicted by other evidence within the

record; and (2) Dr. Ahmed "did not indicate any basis for assessing the claimant

with such severe limitations."

   First, the Commissioner argues that the evidence on the record contradicts

the medical opinion of Dr. Ahmed. The ALJ notes several inconsistencies between Dr. Ahmed's opinion and the record. The ALJ points to Dr. Ahmed's opinion that claimant had no useful ability to perform functions such as travel, either by car or public transportation, and no ability to maintain even basic standards of neatness/cleanliness. The ALJ found those purported difficulties to be inconsistent with claimant's testimony and the record. A review of the record as a whole substantiates those inconsistencies. Gaskill testified that she can drive a car and her step-father's report indicated that Gaskill drives her son to school. Treatment notes from Dr. Wang in November 2007 indicate that Gaskill was dressed appropriately, as do notes from Dr. Hassan in that month. In March 2008, Dr. Gavirneni reported that Gaskill was dressed appropriately. Gaskill's stepfather also reported that she had no problems with personal grooming.

The ALJ also apparently discounted Dr. Ahmed's opinion as conclusory, noting it "did not indicate any basis for assessing the claimant with such severe limitations." Dr. Ahmed's opinion of Gaskill's work capabilities consists entirely of RFC checklist forms; it cites no medical evidence and provides no elaboration. "'The checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value.'" *Wildman*, 495 F.3d at 964 (quoting *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001)).

The ALJ finally found Dr. Ahmed's opinion internally inconsistent. The ALJ inferred that Dr. Ahmed "believed she was benefitting" from her medical regimen because Dr. Ahmed did not modify her prescriptions. However, this does not itself contradict Dr. Ahmed's opinion that Gaskill had marked limitations. *See Pate-Fires v. Astrue*, 564 F.3d 935, 943 (8th Cir. 2009) (finding that a treating physician's notes that a mental disorder is in remission with medication does not indicate that claimant was stable enough to return to work).

Although the ALJ incorrectly noted internal inconsistencies related to the medical regimen, the ALJ provided two independent reasons for which to discount Dr. Ahmed's opinion. Given the conclusory nature of Dr. Ahmed's opinion and the inconsistencies with the record as a whole, the ALJ did not err in disregarding his opinion.

*Dr. Wang*

In examining medical evidence related to Dr. Wang, the ALJ only discusses three particular treatment visits. The ALJ notes an April 2006 treatment, at which time Gaskill's mood was reported as "OK" and her effect as mildly anxious/dysphoric. The ALJ also cites a July 2006 RFC questionnaire in which Dr. Wang estimated that Gaskill would miss more than four days of work per month. The ALJ found this incredible, as Dr. Wang had estimated Gaskill's

impairments to have lasted since a "young age." The ALJ noted that Gaskill had

worked from 1983–1999 and again from 2002–2005, and that such a work record

would be impossible if Gaskill were to actually have missed work that often, "as

no employer would tolerate such absenteeism." Because of this inconsistency, the

ALJ discounted Dr. Wang's opinion regarding the magnitude of Gaskill's

impairments. The ALJ bears the responsibility to fully and fairly develop the

record. *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). Here, the record is

devoid of any substantial evidence that Gaskill's past employers, or even that

employers in general, would not have tolerated "such absenteeism." Additionally,

Gaskill testified that she has anxiety attacks approximately two times per week,

which gives credence to Dr. Wang's estimation of work absences. This Court

therefore finds that the ALJ made an improper credibility determination regarding

Dr. Wang's July 2006 assessment.

Dr. Wang also opined in his November 2007 assessment that Gaskill could

not maintain attention for two-hour segments, sustain an ordinary routine without

special supervision, get along with co-workers or peers without unduly distracting

them or exhibiting behavioral extremes, deal with normal work stress, or carry out

detailed instructions. The ALJ found this opinion inconsistent with Dr. Wang's

own treatment notes, as well as inconsistent with treatment notes from the "Crider

- 23 -

Center."

The ALJ cites to November 2007 and March 2008 visits to the Crider

Center, where she reported that her medications were working well without side

effects. Again, Gaskill's statements that her medications were working well does

not contradict Dr. Wang's opinion regarding her capacity to work while on

medications. *See Pate-Fires*, 564 F.3d at 943. The ALJ also points to two GAF

scores of 60, which denote moderate functional limitations, as inconsistent with

Dr. Wang's more marked assessment. However, GAF scores must not be viewed

in isolation, but rather must be "taken as a whole." *Pate-Fires*, 564 F.3d at 944.

The record reveals the following GAF scores for Gaskill.

- April 2006 - GAF 50
- June 2006 - GAF 50
- July 2006 - GAF 50
- February 2007 - GAF 50
- July 2007 - GAF 50
- August 2007 - GAF 45
- September 2007 - GAF 45
- November 2007 - GAF 46
- November 2007 - GAF 60
- March 2008 - GAF 60

The total GAF score history indicates that Gaskill was above 50 only twice out of

ten times in a twenty-three month period. An examination of the record finds

eight GAF scores at 50 or below, including three scores at 45–46, and only two

scores at 60. The overall history of GAF scores, rather than evidencing

inconsistency, corroborates Dr. Wang's assessment of Gaskill's work abilities.

Further, the V.E. testified that a score of 46 would "preclude competitive

employment." GAF scores ranging 41 through 50 indicate "serious impairment in

social, occupational, or school functioning, such as the inability to keep a job."

DSM-IV at 34. *See Pate-Fires*, 564 F.3d at 944 (citing *Brueggemann v. Barnhart*,

348 F.3d 689, 695 (8th Cir. 2003) (noting a GAF score of 50 reflects a serious

limitation on a claimant's ability to perform basic life tasks; VE testified that

individual with GAF score of 50 could not work)). Substantial evidence does not

support the ALJ's determination that Dr. Wang's opinion is inconsistent with the

objective medical evidence as a whole.

The ALJ also found that Dr. Wang's November 2007 opinion was

inconsistent with his own treatment notes. The ALJ neglected to refer with

specificity to the notes which he found internally inconsistent. Insofar as those

inconsistencies rely on the July 2006 report already addressed, the ALJ's finding

of internal inconsistency is not supported by substantial evidence. Dr. Wang's

opinion must be reevaluated using proper standards.

If the opinion of Dr. Wang is, after reconsideration, properly disregarded,

the ALJ must do his duty to "develop the record fully and fairly." *Nevland v.*

*Apfel*, 204 F.3d at 857. The RFC is a medical question. *Id.* at 858. There must be medical evidence about how a claimant's impairments affect her ability to function. *Id.* If all medical opinions related to the work capabilities of Gaskill are again disregarded, the ALJ should receive a medical opinion from a consultive evaluation to determine the effects Gaskill's impairments have on her ability to be employed. For these reasons, Gaskill's claim must be remanded to the Commissioner for reconsideration.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further development of the record as to the claimant's residual functional capacity.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of December, 2010.